UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

-------------------------------------------------------X

PATRICIA HOEY,
    Plaintiff,

          v.                    Civil Action No. 3:003CV713 (AWT)

JOHN E. POTTER,             July 21, 2004
POSTMASTER GENERAL,
    Defendant.

-------------------------------------------------------X

## DEFENDANT'S LOCAL RULE 9(c)1 STATEMENT

Defendant contends there is no genuine issue of material fact as to the following:

1.    At all times relevant to this civil action, Plaintiff, Patricia Hoey, was employed by the United States Postal Service as a clerk at the Processing and Distribution Center in Stamford, Connecticut. Attachment to Pltf Cmp. at p.5.

2.    Plaintiff is hearing impaired. Id.

3.    In her civil complaint, Plaintiff alleges that on March 19, 2000, while working on a machine, her co-worker, Lisa McCalaster angrily said "you're stupid." Id.

4.    On April 10, 1998, Plaintiff saw McCalaster, "moving up and down in her chair as if she was having sex . . . ." Id. at p.6. This incident was reported to Supervisor Harry Abbott. Id; Declaration of Harry Abbott, attached hereto as Exhibit 2, at ¶ 5.

5.    Plaintiff's coworker, Camille Smuniewski, told Plaintiff that McCalaster and her friends referred to them as "Simple and simpler" and "dumb and dumber." Id. Deposition of Patricia Hoey, (Pltf. Dep), cited portions of which are attached hereto as Exhibit 1, at 38- 39; Ex. 2 at ¶ 5.

6.    Neither McCalaster nor Camille are hearing impaired or otherwise disabled. Ex. 2 at ¶ 5.

7.    On May 8, 1998, while working at a letter sorter machine, McCalaster said to Plaintiff "What the F------ are you looking at?" and "Mind your own F------ business." Id. At that time, a supervisor came and took McCalaster off the floor. Id. Plaintiff wrote a letter to Supervisor Abbott about this incident. Ex. 1, Pltf. Dep at 47; Ex. 2 at ¶¶ 10-11. Paula Moore, Plaintiff's immediate supervisor, removed McCalaster from the work area after the incident. Ex. 2 at ¶¶ 9-10.

8.    On August 3, 1998 and September 1, 1998, Plaintiff's manager pulled her out of a training session she was conducting and told her to go back to work. Id. Plaintiff testified that her manager, Walter Noel, pulled her out of training. She thinks McCalaster is responsible for his actions, but she doesn't know that for a fact. Ex. 1, Pltf. Dep. at 49-50.

9.    In December 1998, plaintiff noticed McCalaster "eyeballing" her. Attachment to Pltf Cmp., at 7.

10.    On an unknown date, according to her co-worker, Camille, McCalaster yelled behind Plaintiff's back in the bathroom in front of other workers, and they laughed. Id. at 8.

2

11.     Plaintiff has not worked with McCalaster since 2003. Ex.1, Pltf. Dep. at 57.

12.     In response to the question why Plaintiff thought McCalaster 's conduct was related to Plaintiff's disability, Plaintiff testified that she thinks it is because McCalaster has to "lip-read her", "to look at her mouth", and McCalaster didn't like this. Ex. 1, Pltf. Dep. at 62. McCalaster told Plaintiff to not read her lips. Id. McCalaster made no other comments about Plaintiff's hearing. Id. at 63.

13.     Plaintiff testified she "doesn't know for sure" what was McCalaster's problem with her. Id. at 69.

14.     Supervisor Abbott discussed Plaintiff's complaint with Plant Manager Richard Bryant, and thereafter, instructed McCalaster's Manager, Walter Noel, to formally discuss Plaintiff's complaint with McCalaster, and to give her a "Zero Tolerance" talk. Ex. 2 at ¶ 7.

15.     Mr. Noel initiated the memorandum on April 13, 1998 signifying that he completed that task. Ex. 2, Attachment A.

16.     Supervisor Paula Moore provided Abbott with her notes of two incidents occurring on May 8, 1998, with attached statements. Both incidents involved Lisa McCalaster, Pat Hoey and co-worker, Camille Smuniewski. Ex. 2 at ¶ 9.

17.     To address the problems that had been occurring in the flat sorter area, Defendant's managers held a meeting with all of the employees on the flat sorter machine to address the postal policy of zero tolerance of acts or threats of violence in the workplace. Employees were told of possible future discipline if violations occurred. A change of supervision was also made in the Flat Sorter area. Ex. 2, at ¶ 13.

3

18.    No discipline was issued to either Plaintiff or McCalaster, and they continued to work without further incident. Ex. 2 at ¶ 14.

19.    Abbott was not informed of the alleged incidents in August and September 1998, or March 1990. Ex. 2 at ¶ 15.

20.    Plaintiff's claim of physical disability had no bearing on actions taken by Abbott or postal management to address the employee problems in the flat sorter area. Ex. 2 at ¶ 16.

Respectfully submitted,

KEVIN J. O'CONNOR
United States Attorney

By:    _Anna Crawford_

Anna V. Crawford
Special Assistant U.S. Attorney
Northeast Area Law Office
United States Postal Service
8 Griffin Road North
Windsor, CT 06006-0170
Tel. (860) 285-7309
Federal Bar No. ct01394

## CERTIFICATE OF SERVICE

I hereby certify that a copy of Defendant's Local Rule 9(c)1 Statement was sent by First Class Mail, this 21st day of July, 2004 to:

Charles G. Parks, Jr.
Parks & Associates
800 Summer Street, Suite 509
Stamford, CT  06901

Anna V. Crawford

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

COPY

- - - - - - - - - - - - - - - - - x
PATRICIA HOEY,                    )     CIVIL ACTION
                Plaintiff,        )     NO:  3:03CV713(AWT)
                                  )
        vs.                       )
                                  )
JOHN E. POTTER, POSTMASTER GENERAL, )
UNITED STATES POSTAL SERVICE,     )
                Defendant.        )     APRIL 15, 2004
- - - - - - - - - - - - - - - - - x


DEPOSITION OF PATRICIA A. HOEY


    Taken before Barbara-Anne V. Scott, LSR #252,
a Court Reporter and Notary Public, within and
for the State of Connecticut, pursuant to Notice
and the Federal Rules of Civil Procedure, at
the United States Attorney's Office, 157 Church
Street, 23rd Floor, New Haven, Connecticut, on
April 15, 2004, commencing at 10:30 a.m.

US P... ...
LAW DEPART...

... 3, 2004

            Falzarano Court Reporters
            117 North Saddle Ridge
            West Simsbury, CT 06092
                860.651.0258

**EXHIBIT 1**

1   my side or the jam was on Lisa's side.   Then I saw her going

2   up and down in the chair as if she was having sick, and at

3   the same time, she had her mouth wide open with her tongue

4   out, wagging (indicating).

5        Q      Wagging her tongue?

6        A      (Indicating.)

7        Q      Who was she looking at?

8        A      Me.

9        Q      Was there anybody --

10       A      She was looking at me.  So I got a little upset,

11   because it was Good Friday.

12       Q      You got upset because it was Good Friday?

13       A      Good Friday.  I mean, it's a holy day.  I didn't

14   have to take that.

15       Q      Is this letter that you wrote dated April 10, 1998,

16   a summary of what happened?

17       A      Yes.

18       Q      Did you leave anything out?

19       A      Well, her and her friends called Camille and I

20   "simple, simpler, dumb, and dumber."

21       Q      That day?

22       A      And I think that's a reference to my handicap.

23       Q      Did Lisa say this on that day?

24       A      She said it that day.

25       Q      When did she say that?

1          A     Maybe in the afternoon.  I don't know.  Maybe

2    a couple hours later.

3          Q     After the earlier incident?

4          A     After that, yes.

5          Q     Okay.  How did you -- did you see her say that?

6          A     No, I didn't see her say it.  I don't look at her.

7    But Camille told me.

8          Q     What did Camille tell you?

9          A     Camille said, They're calling us names.  They're

10   calling us simple and simpler, dumb and dumber.

11         Q     And who did she mean by "they"?

12         A     Lisa and I think Joan Fields.

13         Q     Who is Joan Fields?

14         A     Another worker.  She worked on the flat sorter

15   machine at that time.

16         Q     Did she work on Lisa's side?

17         A     Yes.

18         Q     Okay.  And --

19         A     She worked the primary side, but she comes over,

20   talks to Lisa, and helps out, like loading.

21         Q     She helps her loading?

22         A     Loading.

23         Q     Okay.  She was friendly with Lisa, I take it?

24         A     She was friendly with her, yeah.  They're buddies.

25         Q     Did she ever do anything to you -- Joan Fields,

```
 1        Q    Of what year?  What year?

 2        A    '98.

 3        Q    1998?  What happened that day?

 4        A    I was told that I had to cover at 10:00 the

 5   training room, that someone was coming in.  Three people were

 6   coming in -- 10:00, 10:40, and 11:00 -- so I had to set up

 7   the machine, get it ready for them.  That was in the training

 8   room.  And Lisa saw me go in.

 9        Q    Who told you to go to the training room that day?

10        A    Betty Cushman.

11        Q    So, go ahead.

12        A    And --

13        Q    Go ahead.

14        A    I was in the training room, and we were training.

15   Three people were there.  Walter opened the door and said:

16   Get out'a here!  Get out'a here!

17        Q    Who said that to you?

18        A    Walter Noelle.  I said, Walter, what's the matter?

19             Get out'a here!

20             I'm supposed to cover.  There's people that are

21   working here.  I'm training three people.

22             Get out'a here!  Get out'a here!  Get out'a here!

23        Q    What else did he say?  Anything else?

24        A    No.  So I told the people I have to turn the

25   machine off.  They all left.  I went back to my machine.
```

1    I was humiliated.

2         Q    Why do you think Lisa has anything to do with this

3    incident?

4         A    He was in his office.  He did not know I was in

5    there.  Lisa saw me.  She was eye-balling me, and she saw

6    me go in; and she went to the phone.

7         Q    Do you know who she called on the phone?

8         A    I'm assuming it was Walter, because he came right

9    in after that.

10        Q    Okay.  But you don't know for a fact that she

11   called Walter; is that correct?

12        A    What?

13        Q    You don't know for sure that she did call Walter?

14        A    It's gotta be.  How else did he know where I was?

15        Q    But you don't know for a fact that she called

16   Walter; is that correct?

17        A    How can you prove that?

18        Q    Did Walter say to you that Lisa just called me

19   and --

20        A    No.

21        Q    Did Walter say why he wanted you to get out?

22        A    No.  He wants me out on the floor.

23        Q    Who was your supervisor at that time?

24        A    It was Paula Moore.  Walter Noelle was the MDO.

25        Q    Was her boss as the MDO?

1      A     Yes.

2      Q     Did Betty Cushman talk to your supervisor about

3   whether you could go to the training room, if you know?

4      A     I'm assuming she did, because she told me what

5   time and how many people were coming in.

6      Q     Who told you?

7      A     Betty Cushman.

8      Q     But did you ever go to your supervisor, Paula,

9   and say, I've been asked to go to the training room at this

10  time?

11     A     I don't think so.  I don't remember.

12     Q     What is this document (indicating) that's part of

13  Exhibit 2?  Is it a grievance?

14     A     It was supposed to be for Mr. Williams.

15     Q     Is this document a grievance?

16     A     That's a grievance, yes.

17     Q     Okay.  What happened to your grievance?

18     A     Let me see.  I think it went to the EEO.

19     Q     Did your union pursue some sort of grievance about

20  what had --

21     A     What they said was a Step 3.  It would take a long,

22  long time, so I didn't do anything.

23     Q     So you withdrew it?

24     A     Nothing.

25     Q     Did your union pursue this grievance, do you know?

1    Loretta Bell.  She come over, and she was feeding the
2    machine.  There was two people on the automation, automation
3    machine.
4        Q    Who is "she"?
5        A    Lisa.  Lisa was not working with me.  She's not on
6    automation.  She's on the flat sorter, the new flat sorting
7    machine.
8        Q    When was this?
9        A    Maybe last year.
10       Q    So 2003?
11       A    Before I passed out.
12       Q    Okay.  So what happened then?
13       A    She -- she came over to talk to Loretta Bell, and
14   both of them were loading up, making the machine go so fast;
15   and that was unfair.  I just brushed her off.  I didn't want
16   to have any words with them.  I just brushed her off, went
17   to the ladies room.  When I come back, Lisa was gone.
18             And then two weeks later, the same thing happened,
19   I walked away again, and I stayed away a little longer.
20   When I come back around, Loretta Bell is dragging and Lisa's
21   feeding.  When I come back, Loretta went back to feeding the
22   machine and Lisa left, but she never came back after that.
23       Q    Did you have any more problems with Lisa in 1998
24   after August of 1998?
25       A    No.  But I have Bob and Paula.  Remember what

1    there was nothing they were doing.  Lisa was never

2    disciplined.

3        Q    How do you know that?

4        A    Because I've always seen her there all the time.

5    With discipline, she maybe disappear for one week or, like,

6    two weeks, or something like that.

7        Q    Do you know for a fact if she was ever disciplined

8    or not?

9        A    I don't know.

10       Q    Did you have any other problems with Lisa

11   McAllister other than the ones you've mentioned in 1998 and

12   then later in 2003?

13       A    I avoid her.  I don't have any problems, because

14   I avoid her.  I don't talk to her.  I remember one time I

15   was in the ladies room, and she knew that I couldn't hear

16   her when she's behind me; and she would yell and scream.

17   I don't know what she was saying, but everybody was

18   laughing.

19       Q    How did you know she was yelling and screaming?

20       A    Camille told me.  Camille was with me.

21       Q    In the bathroom?

22       A    Yeah.  So I went to the supervisor, Richard Fieuri,

23   and I told him.  He said, I can't do anything.  I wasn't in

24   there.

25       Q    When was that?  Do you recall?

```
 1        A     I don't know.  I have it somewhere.

 2        Q     Was it in 1998 when this happened?

 3        A     I got it documented somewhere.

 4

 5               (Pause.)

 6

 7               MR. PARKS:  While she's looking for it, is

 8         this a good time to take a short break?  Go off

 9         the record for a minute?

10               MS. CRAWFORD:  Sure.

11

12               (Recess:  12:24 to 12:35.)

13

14   BY MS. CRAWFORD:

15        Q     Okay.  Did you figure out when the incident

16   occurred with --

17        A     I looked at that.  May the 8th, 1999.

18        Q     What are you looking at?

19        A     They're all the same.

20        Q     What document are you looking at?

21        A     The EEO.

22        Q     Affidavit?

23        A     Yes.

24               MS. CRAWFORD:  Why don't we stop for a minute,

25         and we'll mark this.
```

```
 1        A     Maybe.  Maybe after '98.

 2        Q     Okay.  Going back to the incidents in 1998, do you

 3   believe that you were being discriminated against because of

 4   your disability?

 5        A     Yes.  She said, Don't be looking down my throat.

 6        Q     Who said that?

 7        A     Lisa.

 8        Q     Why do you think that has something to do with

 9   your disability?

10        A     Because I have to lip-read her, so I have to look

11   at her mouth.  So she said:  Stop looking at my throat.

12   I hate when you do that.

13        Q     Why else do you think she was treating you this

14   way because of your disability?

15        A     I think maybe because she didn't like me working

16   with Camille.  She didn't like Camille, and she took it out

17   on me.

18        Q     But why do you think it's because of your

19   disability or related to your disability that she was

20   acting this way?

21        A     Well, she was picking on me because I can't hear.

22        Q     Did she ever say anything to you about your

23   hearing?

24        A     She said something about, Don't be reading my lips.

25        Q     Don't be reading --
```

1        A    Get out of my face.

2        Q    How far away did you work physically from each

3    other?

4        A    Well, if you can imagine 50 buckets lined up, so

5    it would be a little longer than this room.

6        Q    That's how far apart you would stand?

7        A    That's how far apart we are, but she drags the

8    bucket.  It comes down here, and I go up this way dragging

9    the bucket; so we're right next to each other.

10       Q    Okay.  Did she ever make any other comment to

11   you about your hearing?

12       A    Nothing I know of.  I don't look at her.

13       Q    Is there any other reason why you think she was

14   acting this way or treating you this way because of your

15   disability?

16       A    I don't know, because -- maybe it's because she

17   wanted to fill up the machine with her friends; to try to

18   get me discouraged, so I will get off.  That may be one

19   reason.

20       Q    I'm just asking you if there's any other basis

21   on which you believe you were being treated this way because

22   of your disability?

23       A    Because she keep saying:  Get out of my face.

24   Don't be looking at me.  Stop reading my lips.  Don't be

25   looking down my throat.  She even told one of the

1   supervisors, Oh, Pat's looking at me.

2      Q    How do you know that?

3      A    Because I can read her lips.

4      Q    And who was the supervisor she said that to?

5      A    Who did she say it to?  He's not there now.  He

6   retired.  Ivan San Diego.

7      Q    Ivan San Diego.  Is there anything else that Lisa

8   McAllister did that made you think she was treating you this

9   way because of your disability, other than --

10      A    I don't hear her, but I know she hates me.  And

11   when I look at her, she would say anything.  She'd eye-ball

12   me.

13      Q    Is there anything else besides what you've

14   described that made you think she was acting this way because

15   of your hearing disability?

16      A    I don't know anything else.  I can't -- I just

17   don't look at her, so I don't know.  I can't go around asking

18   anybody, because she'll come over and say to me, Don't

19   mention my name.

20      Q    Did Camille tell you that she said anything about

21   your hearing in her presence?

22      A    My hearing?  She calls me deaf and dumber.

23      Q    Deaf and dumber?

24      A    No.  Dumb and dumber.

25      Q    Dumb and dumber.

1       A       Simple, simpler.

2       Q       Does Camille have a disability, if you know?

3       A       No.

4       Q       Is there anyone else that has a disability on that

5    work crew, if you know?

6       A       One guy had -- was epileptic, but he doesn't work

7    with us.  He's a mail handler.  He's retired now, retired

8    on disability.

9       Q       When you worked with Lisa McAllister on that

10   machine, when she was on the other side of that machine,

11   was there anybody else in your work crew who had

12   a disability?

13      A       No.

14      Q       Are there any witnesses to any of this conduct

15   that you would be calling as witnesses in your behalf?

16      A       Well, if I mention names, it's going to be her

17   friends and they're going to lie.  They stick up for her.

18   Do you want their names anyway?

19      Q       Who would have witnessed the conduct that you're

20   describing here?

21      A       Valerie Corley.

22      Q       Who?

23      A       Valerie Corley.

24      Q       Valerie Cawley?

25      A       C-o-r-l-e-y.

1    A    I think it was -- I don't know when.  I don't have
2  it documented, so I don't know.

3    Q    Is there anything else that happened to you during
4  this time period when you were having problems with Lisa that
5  made you think that you were being treated the way you were
6  because of your disability?

7    A    Maybe when she talked.  She tell people:  Time to
8  drag.  Ordered that, We're gonna work on third-class flats,
9  or, We're gonna work on second-class flats.  She gives the
10  orders, because she got it from the supervisor.  Maybe she
11  doesn't like it when I don't look at her to get what we're
12  gonna do, the next operation.

13    Q    You're talking about Lisa?

14    A    Yeah, yeah.

15    Q    Are you just guessing about her motives; is that
16  it?

17    A    I don't think she likes -- I'm thinking that she
18  doesn't like it because I don't listen to her, because I'm
19  not looking at her.

20    Q    Okay.  But are you guessing about what her problem
21  is with you?

22    A    I don't know for sure.

23    Q    Is there anybody else, any other co-worker who
24  worked on this flat sorter operation, who would yell at other
25  co-workers in the group besides --

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

-----------------------------------------------------X

PATRICIA HOEY,

      Plaintiff,

        v.                    Civil No. 3:03CV713 (AWT)

JOHN E. POTTER,
POSTMASTER GENERAL,
UNITED STATES POSTAL SERVICE

      Defendant.

-----------------------------------------------------X

## DECLARATION OF HARRY ABBOTT

      I, Harry Abbott, make the following declaration in lieu of an affidavit, as permitted

by 28 U.S.C. § 1746.

1.     I am over 18 years of age and understand the obligations of an oath. I

understand and intend for this declaration to be introduced as evidence in the above-

captioned case. This declaration is made upon knowledge obtained as a result of my

review of official records of the United States Postal Service.

2.     I am employed by the United States Postal Service as Manager, Vehicle

Maintenance Office, Stamford, CT.

3.     At the time of the incidents alleged, I was a Supervisor, Distribution Operations

(SDO) at the Stamford Processing & Distribution Center, 427 West Avenue, Stamford,

CT.

**EXHIBIT 2**

4.      As SDO, among other duties, I was assigned the administrative responsibility to insure that supervisors conducted investigations regarding employee complaints and that they followed up on complaints.

5.      In reference to the allegations raised by Patricia Hoey, on April 10, 1998, I received a complaint from Ms. Hoey regarding her co-worker, Lisa McCalaster. Ms. Hoey believed that Lisa was making fun of her because of her disability. Ms. Hoey is hearing impaired. Lisa McCalaster is not hearing impaired or otherwise disabled to my knowledge.

6.      Ms. Hoey provided me with a statement indicating that on April 10, 1998, she saw Lisa moving up and down in her chair as if she was having sex, with her mouth wide open and her tongue out, wagging. She also claimed that Lisa called her and a co-worker, Camille Smuniewski, "Dumb & Dumber" and "Simple and Simpler". Pat also stated she had provided the Acting Plant Manager, Richard Bryant, with a letter about Lisa McCalaster approximately three weeks prior to the incident of April 10, 1998. I asked Pat if she had notified her Manager Distribution Operations, Walter Noel, about her problems. Pat replied she would not approach Walter because she believed that Lisa is one of Walter's "favorites".

7.      I discussed Ms. Hoey's complaint with Richard Bryant, and he acknowledged receiving a letter from Patricia Hoey. Thereafter, I instructed MDO, Walter Noel, to formally discuss Ms. Hoey's complaint with Lisa McCalaster, and to give her a "Zero Tolerance" talk. Mr. Noel initiated the memorandum on April 13, 1998 signifying that he completed that task. See Memorandum attached hereto as Attachment A.

8.    On May 12, 1998, I sent a memo to the SDO, Paula Moore, requesting the notes of her investigation from an incident occurring on May 8, 1998 between Pat Hoey and Lisa McCalaster.

9.    Supervisor Paula Moore provided me with her notes of two incidents occurring on May 8, 1998, with attached statements. Both incidents involved Lisa McCalaster, Pat Hoey and co-worker, Camille Smuniewski. To my knowledge, Camille Smuniewski is non-disabled.

10.    On May 8, 1998, Pat Hoey visited me during her break. She told me that an incident had occurred on that date at the flat sorter machine between her and Lisa McCalaster. I asked Pat to provide a statement.

11.    Pat's statement revealed that she was watching Camille Smuniewski throw mail in the bucket on Lisa McCalaster's side when she saw Camille ask Lisa a question. According to Pat, Lisa answered her annoyingly, and Camille walked away saying "Forget it". Pat looked at Lisa. Lisa quickly and verbally attacked her loudly so that everyone looked at her when she said, "What the f--- are you looking at" and "I wasn't even talking to you, mind your f------ business". Pat reported this to SDO, Paula Moore, who came and took Lisa off of the workroom floor.

12.    Paula confirmed that she had pulled Lisa off of the workroom floor to counsel her about the incident.

13.    To address the problems that had been occurring in the flat sorter area, management also held a meeting with all of the employees on the flat sorter machine to address the postal policy of zero tolerance of acts or threats of violence in the

3

workplace. Employees were told of possible future discipline if violations occurred. A change of supervision was also made in the Flat Sorter area.

14.    No discipline was issued to either Ms. Hoey or Lisa McCalaster, and they continued to work without further incident.

15.    I was not informed of the alleged incidents in August and September 1998, or March 1990.

16.    Pat Hoey's claim of physical disability had no bearing on actions taken by postal management to address the employee problems in the flat sorter area.


I certify under the penalty of perjury that the foregoing is true and correct to the best of my knowledge and information.


Executed on July 19, 2004.

Harry Abbott

# Memorandum

**To:**  Walter Noel

**CC:**  Richard Bryant

**From:**  Harry Abbott

**Date:**  April 10, 1998

**Re:**  Zero Tolerance

---

I have received a zero tolerance complaint from clerk Pat Hoey. She has provided a statement concerning harassment by clerk Lisa McCallaster. She stated that this has been going on for about one year. Three weeks ago she wrote a note to the Plant Manager concerning the harassment. She is requesting that management talk to Lisa and have her stop her comments and actions against her.

Complaint of 4/10/98

There was a jam on FSM # 61. Pat presented that she looked to see where the lights were on and saw Lisa McCallaster moving up and down in her chair as if she was having sex with her mouth wide open and her tongue out, wagging. She felt that she was making fun of her because of her disability.

On going complaint

Lisa calls Camille and her names. Examples of these are simple and simpler and dumb and dumber. She feels that these comments are a reference to her handicap.

You are instructed to give Lisa McCallaster an individual ZERO Tolerance talk and to inform her of the complaint against her. A signed copy is to be returned to me for her file.



4-13-98

CONFIDENTIAL

1

**ATTACHMENT A**

Human Resources
Connecticut District

**UNITED STATES**
**POSTAL SERVICE**

DATE:        **May 19, 1995**

**POST PERMANENTLY**

OUR REF:   NEACD:GPNewlan:ll:9994

SUBJECT: **Acts and Threats of Violence in the Workplace**

TO:        **ALL EMPLOYEES**
           CONNECTICUT PERFORMANCE CLUSTER

Acts and threats of violence in the workplace are one of the most serious and frustrating problems facing the Postal Service and its employees. Reported cases of workplace violence has been on the rise in the Postal Service. These incidents seriously impact the reputation, credibility and morale of the Postal Service and its 750,000 employees. In the past, the Postal Service has been inconsistent in the handling of these behavioral issues, and that has caused not only a problem for managers, but in many cases, a greater problem for the employees who are forced to work in an atmosphere of fear and frustration.

Effective immediately, we wish to make absolutely clear to all employees that in the future our policy on acts and threats of violence is as follows:

## THERE WILL BE ZERO TOLERANCE OF ACTS OR THREATS OF VIOLENCE IN OUR WORKPLACE

This includes, but is not limited to:

- Any act of physical violence
- Any actual, implied or veiled threat, made seriously or in jest
- Any type of vulgar language which would lead to a hostile workplace

In order to protect the overwhelming majority of excellent employees, we are giving fair warning to that very, very small minority of violence inclined individuals, that each and every act or threat of violence from this day forward will elicit an immediate and firm response that could, depending on the severity of the incident, include removal from the Postal Service.

No one wants to work in an atmosphere of fear and intimidation. It is in the interest of both Labor and Management to have a violence free environment. We will do whatever it takes to provide that environment.

We ask for your support and understanding concerning the enforcement of our Zero Tolerance policy. It is designed to provide you with a workplace in which you can feel safe and secure.

### You deserve no less!

Jo Saunders
District Manager,
Customer Service & Sales
141 Weston Street
Hartford, CT 06101-9990

William Galligan
Manager, Hartford P & D Center
141 Weston Street
Hartford, CT 06101-9997

Bernard McNamara
Manager, Southern Connecticut P & D Center
50 Brewery Street
New Haven, CT 06511-9997